**SIERRA CLUB, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION (USDOT); Secretary of Transportation Norman Mineta; Federal Highway Administration (FHWA); Administrator of FHWA Mary Peters; Division Administrator of FHWA Nevada Division, John Price, Defendants.**

No. CV–S–02–0578–PMP RJJ.

United States District Court,
D. Nevada.

March 11, 2004.

Patrick Gallagher, Sierra Club, Sanjay Narayan, Sierra Club, San Francisco, CA, Margaret L. Sanner, Morris Pickering & Sanner, Las Vegas, Joanne Spalding, Sierra Club, San Francisco, Robert E. Yunke, Boulder, CO, for Plaintiff.

Rimantas A. Rukstele, U.S. Attorney's Office, Las Vegas, for Defendants.

## ORDER

PRO, Chief Judge.

Presently before this Court are cross-motions for summary judgment. Defendants United States Department of Transportation ("USDOT"); Secretary of Transportation Norman Mineta; Federal Highway Administration ("FHWA"); FHWA Administrator Mary Peters; and FHWA Division Administrator John Price (collectively "Defendants" or "FHWA")

filed a Motion for Summary Judgment (Doc. # 74) on June 30, 2003. Plaintiff Sierra Club also filed a Motion for Summary Judgment (Doc. # 76) on June 30, 2003. Both parties filed Responses (Docs.# 86, 87) on August 29, 2003, and filed Replies (Docs.# 96, 97) on October 20, 2003. On February 18, 2004, the Court conducted a hearing regarding the foregoing Motions.

Also before the Court is Plaintiff Sierra Club's Third Motion to Supplement Administrative Record and Request for Judicial Notice (Doc. # 100), filed on March 4, 2004. FHWA filed Federal Defendants' Response to Plaintiff's Third Motion to Supplement the Administrative Record (Doc. # 102) on March 8, 2004. The Court conducted a teleconference hearing on this motion on March 9, 2004.

## I. BACKGROUND

Sierra Club commenced this action for injunctive and declaratory relief on April 22, 2002, pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the Federal–Aid Highway Act as amended by the Transportation Equity Act for the 21st Century, 23 U.S.C. §§ 101 *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.* ("APA") and these statutes' implementing regulations. Sierra Club seeks injunctive and declaratory relief relating to FHWA's approval of a proposed project to widen US–95 to ten lanes. (Compl.¶¶ 34–36.) Sierra Club claims that in reaching the decision to approve the US–95 widening project, FHWA did not adequately discharge various statutory duties. (Compl.¶ 1.)

First, Sierra Club challenges the adequacy of the Environmental Impact Statement ("EIS") FHWA prepared for the proposed project. Sierra Club asserts the EIS did not adequately identify and study the project's direct, indirect, and cumulative impacts, such as induced growth, induced travel, adverse health impacts from increased motor emissions, air quality impacts during construction, and social and fuel costs of traffic delays during construction. (Compl. ¶¶ 117–18 [Count 1].) Sierra Club also argues FHWA relied on inaccurate information in preparing the EIS, particularly in its use of unreliable traffic and population projections. (Compl. ¶¶ 120–121 [Count 2].) Additionally, Sierra Club alleges the EIS failed to identify and analyze all reasonable alternatives. Sierra Club particularly takes issue with the EIS's failure to consider a fixed guideway alternative. (Compl. ¶¶ 124–26 [Count 3].) Sierra Club also argues FHWA inadequately responded to comments by the United States Environmental Protection Agency ("EPA") and others that the project would not meet project goals, and that the EIS failed to consider induced demand and public health risks created by the project. (Compl. ¶¶ 129–131 [Count 4].)

In addition to its concerns about the EIS, Sierra Club alleges FHWA violated NEPA by refusing to prepare a supplemental EIS ("SEIS") following Sierra Club's two requests that FHWA do so. According to Sierra Club, NEPA requires FHWA to prepare a SEIS to study induced travel and health risks associated with the project. (Compl. ¶¶ 133–36 [Count 5].)

Finally, Sierra Club contends FHWA violated federal highway statutes and their implementing regulations. Sierra Club asserts the EIS failed to consider mitigation of adverse health impacts as required by 23 U.S.C. § 109. Sierra Club also challenges whether FHWA's "open house" hearings satisfy 23 U.S.C. § 128's public hearing requirement. (Compl. ¶¶ 138–142 [Counts 6, 7].)

### 1. The Major Investment Study

Nevada is the fastest growing State in the United States, having doubled in population every decade since 1970. (Administrative Record ["AR"] 30–14496.) A large percentage of that growth is occurring in the northwest portion of the Las Vegas metropolitan area. (*Id.*) The primary employment center in Las Vegas is the Resort Corridor, a centrally located area in which many of the city's resort hotels are situated. (*Id.*) Although several major roadways link the northwest to the Resort Corridor, US–95 is the only freeway serving the northwest region. (AR 01–00052.)

US–95 is a six-lane freeway extending westward for five miles from the downtown I–15/US–95 interchange to the Summerlin Parkway/Rainbow Boulevard interchange. (AR 01–00057.) At the Summerlin Parkway/Rainbow Boulevard interchange, US–95 constricts to four lanes, and turns northward for five and one half miles to the Rancho interchange. (*Id.*) At Rancho, US–95 turns northwestward towards Tonopah. (*Id.*)

The rapid population growth in the northwest is overwhelming the capacity of existing transportation facilities. As of 1995, traffic volumes on approximately forty miles of roadways in the northwest, including US–95, exceeded road capacity during the evening peak-hour of traffic. (AR 01–00091.) Commuter trips between the northwest and the Resort Corridor are expected to increase by fifty-four percent by 2015. (AR 01–00064.) In the absence of any improvements, by the year 2015, peak-hour traffic volume is expected to equal or exceed capacity on over one hundred miles of roadway in the northwest. (AR 01–00019.)

In addition to these transportation problems, air quality in the Las Vegas valley has fallen below the EPA's national ambient air quality standards ("NAAQS") promulgated under the Clean Air Act. (AR 30–14726.) The EPA has classified Clark County, Nevada as a serious nonattainment area for the air pollutants carbon monoxide and particulate matter ($PM_{10}$).[1] (*Id.*)

In response to this rapid growth and increased congestion, the Nevada Department of Transportation ("NDOT"), in cooperation with the Regional Transportation Commission ("RTC"), the Cities of Las Vegas and North Las Vegas, and Clark County initiated a Major Investment Study ("MIS"). (AR 01–00048.) The purpose of the MIS was:

> to develop a program to meet the short and long term transportation needs of the Northwest Region of the Las Vegas Valley. The Study will identify and evaluate alternatives which will provide increased opportunities for enhanced mobility for Valley residents. The Study will seek technically sound, practical solutions in response to the need to relieve congestion to accommodate the continued growth of the community.

(AR 02–00782.) The MIS proceeded in two phases. The first phase consisted of

---

[1]. The EPA first designated the Las Vegas Valley as a carbon monoxide nonattainment area in 1978. *See* Approval and Promulgation of State Implementation Plans; State of Nevada; Clark County, 68 Fed.Reg. 4141, 4141–42 (Jan. 28, 2003). On October 2, 1997, EPA published a final rule reclassifying the Las Vegas Valley from moderate to serious nonattainment for carbon monoxide. *Id.* In 1990, EPA designated Las Vegas as a moderate non-attainment area for particulate matter. *See* Approval and Promulgation of Implementation Plans; Nevada—Las Vegas Valley PM–10 Nonattainment Area; Serious Area Plan for Attainment of the Annual and 24–Hour PM–10 Standards, 68 Fed.Reg. 2954, 2955 (Jan. 22, 2003). In 1993, EPA reclassified the area from moderate to serious because of continuing violations of the particulate matter NAAQS. *Id.*

articulating the purpose and need for the project, identifying improvement alternatives, initiating public involvement, and developing an early action plan. (AR 01–00188.) The second phase consisted of an evaluation of alternative strategies to meet the area's short and long term transportation needs. (AR 02–00914.)

During the first phase, NDOT, through its consultant Louis Berger & Associates, prepared a series of technical memoranda "to identify and analyze investment needs and opportunities for major transportation infrastructure and services that could best alleviate mobility problems in the Northwest Region." (AR 01–00050; 01–00048–01–00113; 01–00117–01–00142; 01–00184–01–00419; 01–00420–02–00776; 04–01651–04–02033; 05–02034–05–02458.) NDOT also prepared and issued an Early Action Plan ("EAP") in May 1996. (AR 01–00143–00183.) The EAP identified improvements that could be implemented within a one-year time frame to temporarily relieve congestion in the northwest.[2] (AR 01–00146.)

As a result of these efforts, NDOT produced a Preliminary Evaluation of Alternatives ("PEA") in February 1997. (AR 02–00777–02–00904.) The report's purpose was "to identify alternatives which would be effective in reducing congestion and improving mobility in the Northwest Region." (AR 02–00779.) The PEA relied on the RTC's TRANPLAN travel demand forecasting model. (AR 02–00920.) This model reports trip patterns and purposes in terms of "person trips." (*Id.*) "Person trips vary from vehicle trips because of the potential of multiple occupancy in private vehicles and the use of public transit." (*Id.*) Based on traffic projections using TRANPLAN, the PEA projected a capacity shortfall in 2015 of approximately 23,000 vehicle trips during the peak hour, or ap-

proximately 30,000 person trips. (AR 02–00793.)

The PEA identified a variety of alternatives to address this capacity shortfall. The PEA considered widening US–95, double decking US–95, installing reversible or high occupancy vehicle ("HOV") lanes on US–95, enhancing bus services, developing fixed guideway transit, and creating new freeways or super arterial corridors. (AR 02–00782.)

The report concluded "no individual project could be expected to provide sufficient capacity to accommodate projected growth through the year 2015." (*Id.*) Consequently, the PEA recommended considering alternatives in combination to meet the projected capacity shortfall. (*Id.*) The report recommended three possible strategies, all consisting of combined projects: (1) the US–95 Improvement Strategy involving a widened or double decked US–95, a freeway management system, regional street system improvements, and continued conventional bus service; (2) the Fixed Guideway Strategy involving enhanced bus service, transportation demand management, fixed guideway transit, regional street system improvements, and a freeway management system; and (3) the Rainbow/Desert Inn Super Arterial Strategy involving a Rainbow/Desert Inn super arterial corridor, regional street system improvements, a freeway management system, transportation demand management, and enhanced bus service. (AR 02–00796.)

In April 1997, NDOT prepared the MIS Detailed Evaluation of Alternative Strategies. (AR 02–00910–03–01137.) This report evaluated and compared in detail the three recommended strategies. (AR 03–01092–03–01137.)

---

**2.** Sierra Club does not challenge any im- provements undertaken as part of the EAP.

Based on these comparisons, the MIS adopted a variation of the US–95 Improvement Strategy as the "locally preferred alternative." (AR 03–01124.) The locally preferred alternative consisted of widening various portions of US–95 and the Summerlin Parkway, constructing HOV lanes on US–95 and the Summerlin Parkway, improving arterial street connections, widening various arterial streets, enhanced bus service, a freeway management system, and transportation demand management measures. (AR 03–01124.) NDOT anticipated the locally preferred alternative would accommodate an additional 36,000 person trips at a cost of approximately $432 million. (AR 03–01130; 03–01134.)

In adopting the locally preferred alternative, the MIS rejected the Fixed Guideway and Super Arterial Strategies. The MIS rejected the Fixed Guideway Strategy because the MIS calculated it would not meet the projected capacity shortfall, would cost hundreds of millions more than other alternatives, and would depend on the Resort Corridor Fixed Guideway ("RCFG"), which had not yet been approved or funded. (AR 03–01130; 09–04510.) The MIS also rejected the Super Arterial Strategy "[d]ue to the relatively high cost for limited increased capacity and the high level of impacts . . . ." (*Id.*)

### 2. The NEPA Process

Following adoption of the locally preferred alternative, NDOT and FHWA began the environmental review process mandated by NEPA by filing a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") on April 23, 1997. (AR 03–01258, 62 Fed.Reg. 19850–51 (Apr. 23, 1997).) FHWA and NDOT subsequently prepared various technical reports analyzing potential impacts of the project. The reports considered as alternatives two similar options which would widen US–95

either north or south of the existing freeway and a "no build" option. The reports analyzed potential impacts to archaeological resources, soils and water resources, hazardous materials, socioeconomic factors and land use, vegetation and wildlife, air quality, and cultural resources. (AR 11–04964; 11–05248; 12–05788; 14–06507; 17–07901; 25–12032; 25–12147; 26–12350.)

On May 5, 1999, FHWA released the Draft EIS ("DEIS") for public review. (AR 28–13713.) The agency accepted public comment on the DEIS for over sixty days. (AR 28–13670–28–13673; AR 29–13898 [64 Fed.Reg. 24649 (May 7, 1999)].) FHWA held two public hearings on June 9 and 10, 1999. (AR 28–13670.) During the comment period, NDOT and FHWA received various comments from members of the public and government agencies, including EPA, regarding the proposed project's potential adverse impacts on air quality, induced growth, and induced travel; the failure to include analysis of any alternatives to widening US–95 beyond the "no-build" option; whether the project would become congested soon after completion; the DEIS's reliance on allegedly inaccurate traffic and population forecasts; and objections to NDOT's "open house" format public hearings. (AR 33–15184–33–15242; 33–15269–33–15380; 33–15393–33–15567; 33–15585–33–15763.)

After the comment period closed, NDOT and FHWA prepared a Final EIS ("FEIS"). (AR 30–14415–33–15979.) The FEIS included the agencies' responses to comments received during the comment period. (AR 33–15246–33–15267; 33–15385–33–15391; 33–15574–33–15583; 33–15769–33–15788.) FHWA approved the FEIS, and, on December 3, 1999, published notice of its availability in the Federal Register. (AR 30–14412; 33–16108 [64 Fed.Reg. 67897 (Dec. 3, 1999)].) The agencies again accepted public comment

for thirty days. (AR 33–16108 [64 Fed. Reg. 67897 (Dec. 3, 1999)].) Public citizens, watchdog groups, and EPA again commented on the FEIS, raising many of the same concerns expressed with respect to the DEIS. (AR 33–16211–33–16233; 34–16412–34–16425.) On January 28, 2000, FHWA issued a Record of Decision ("ROD") selecting the proposed US–95 widening project, with widening to occur to the north of the existing freeway. (AR 33–16403.)

### 3. Requests for a SEIS

On June 20, 2000, Plaintiff Sierra Club requested FHWA and NDOT prepare a Supplemental Environmental Impact Statement ("SEIS") to address new information documenting a "connection between vehicle emissions and cancer in communities adjoining highways." (AR 34–16446.) Sierra Club also requested the agencies prepare a SEIS in response to new information relating to induced travel. (AR 34–16447.) On July 17, 2000, FHWA denied Sierra Club's request. (AR 34–16702.)

Sierra Club then commissioned two independent studies regarding the effect that the US–95 widening project would have on people who live, work, or attend school near that portion of the highway. (AR 35–16734.) Both studies concluded FHWA should prepare a SEIS to evaluate health effects from air pollution arising from widening US–95. Sierra Club forwarded these studies to FHWA and again requested that FHWA prepare a SEIS. On February 5, 2002, FHWA again denied Sierra Club's request. (AR 35–16881.) Following FHWA's second denial, Sierra Club filed this action.

### 4. Motion to Dismiss

On August 7, 2002, Defendants filed a motion to dismiss the Complaint based on the doctrine of laches. (Doc. # 11.) Defendants argued that because Sierra Club did not file suit until over two years after FHWA issued the ROD, Sierra Club waived its claims. (Id.) Sierra Club responded that a laches defense is disfavored in the environmental context, that Sierra Club diligently pursued its claims through the administrative process, and that Defendants were not prejudiced by the delayed filing. (Doc. # 18.)

On February 14, 2003, this Court denied Defendants' motion. Sierra Club v. U.S. Dep't. of Transp., 245 F.Supp.2d 1109 (D.Nev.2003) (Doc. # 34). Initially, the Court noted that a laches defense rarely should succeed in environmental cases. Id. at 1115. To determine whether laches should bar the Complaint, the Court considered Sierra Club's diligence in pursuing its claims and whether Defendants would be prejudiced by the continued prosecution of the case. Id. The Court concluded Sierra Club was diligent in pursuing its claims because it was active throughout the public comment process on the widening project and because part of the delay was attributable to Sierra Club's commissioning of two studies. Id. at 1115–17. The Court also considered prejudice in terms of whether the environmental harm Sierra Club seeks to prevent is irreversible. Id. at 1117. The Court concluded that because the freeway widening had not occurred, FHWA's further consideration of environmental concerns could prompt reconsideration of the project, changes in the design, or consideration of other alternatives. Id.

### 5. Third Request to Supplement the Administrative Record

On March 4, 2004, Sierra Club filed a motion to supplement the administrative record. (Doc. # 100.) Sierra Club requests the Court consider recently-issued EPA policy guidance officially adopting the

MOBILE6.2 emissions model that is now capable of modeling emissions for air toxics and $\dot{P}M_{2.5}$. (Pl. Sierra Club's Third Mot. to Supplement Administrative R. and Request for Judicial Notice ["Third Mot. to Supplement R."], Ex. A.) Sierra Club argues EPA's issuance of this guidance is significant because FHWA consistently has relied on the absence of available modeling tools as a reason not to further study air toxics and $PM_{2.5}$ in the EIS or in a SEIS. FHWA does not oppose the motion to supplement the record with EPA's policy guidance. (Fed. Defs.' Resp. to Pl.'s Third Mot. to Supplement the Administrative R. at 2.) But FHWA contests the significance of EPA's policy guidance as it relates to the US–95 widening project EIS.

The parties now cross move for summary judgment on all counts. The parties dispute whether the EIS was adequate; whether FHWA violated NEPA by refusing to prepare a SEIS; whether the EIS adequately addressed mitigation of adverse air quality impacts; and whether the open house format fulfilled federal highway statutory and regulatory public hearing requirements.

## II. JUSTICIABILITY

█ Both standing and mootness are jurisdictional issues deriving from the "case or controversy" requirement of Article III of the United States Constitution. *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1098 (9th Cir.2000). Although the parties do not raise either issue, this Court has an independent obligation to examine its own jurisdiction. *Public Citizen v. Dep't of Transp.,* 316 F.3d 1002, 1014 (9th Cir.2003), *cert. granted, Dep't of Transp. v. Public Citizen,* —— U.S. ——, 124 S.Ct. 957, 157 L.Ed.2d 793 (2003).

### A. Standing

█ "The standing inquiry focuses upon whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, and serves to ensure that legal questions presented to the court will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Hall v. Norton,* 266 F.3d 969, 975 (9th Cir.2001) (quotations, alterations, and internal citation omitted). Sierra Club must overcome three standing hurdles: (1) Article III standing; (2) organizational standing; and (3) statutory standing under the APA.

### 1. Article III Standing

█ To establish standing under Article III of the United States Constitution, a plaintiff must show:

"(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Public Citizen,* 316 F.3d at 1015 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)).

### a. Injury in Fact

█ Plaintiff Sierra Club asserts procedural injuries arising out of FHWA's alleged violation of NEPA and APA. "To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that 'the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing.'" *Cantrell v. City of*

*Long Beach,* 241 F.3d 674, 679 (9th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The "procedures in question" here consist of NEPA and its implementing regulations. NEPA requires federal agencies to perform certain environmental analyses before taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332.

■ In NEPA cases, a plaintiff may demonstrate a "concrete interest" by showing a " 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." *Cantrell,* 241 F.3d at 679 (quoting *Douglas County v. Babbitt,* 48 F.3d 1495, 1500 n. 5 (9th Cir.1995)). Sierra Club has members who live in Las Vegas, and who participated in the NEPA process with respect to the US–95 widening project.[3] Sierra Club alleges that widening US–95 will lead to the deterioration of air quality in Las Vegas, encourage urban sprawl, and result in the same level of congestion soon after completion of the freeway expansion. The Ninth Circuit has held that "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." *Hall,* 266 at 976; *see also Public Citizen,* 316 F.3d at 1015–16 (organizational plaintiff stated cognizable injury in fact by alleging its members would suffer adverse health effects due to emissions from Mexican-domiciled trucks permitted into the country under USDOT regulations). Thus, Sierra Club has stated a cognizable injury in fact including potentially increased exposure to auto emissions as a result of the widening project.

### b. Causation

■ "Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell,* 241 F.3d at 682. "Unlike in an ordinary causation analysis, a petitioner asserting a procedural injury need only establish the reasonable probability of the challenged action's threat to [his] concrete interest." *Public Citizen,* 316 F.3d at 1016 (quotations and emphasis omitted).

■ Sierra Club has presented evidence supporting a reasonable probability that expanding US–95 to ten lanes could lead to increased emissions of carbon monoxide, particulate matter, fine particulate matter, and mobile source air toxics. Sierra Club also has presented evidence that suggests these pollutants are or may be linked to increased cancer risks. (AR 34–16448–34–16566; 34–16567–34–16579; 35–16757–35–15763; 35–16764–35–16782.) Because EPA has designated Las Vegas as a seri-

---

**3.** Sierra Club describes itself as "a national, non-profit environmental and conservation organization organized under the laws of the State of California." (Compl.¶ 8.) Sierra Club asserts it has over four thousand members living in Nevada, including many who "live, recreate or work within the proposed US–95 Widening Project Area." (Compl.¶ 9.) Sierra Club alleges its members will be harmed by increased air pollution, and urban sprawl reducing aesthetic and recreational opportunities. (Compl.¶¶ 10–13.) During the MIS and EIS process, Sierra Club Southern Nevada Group members attended public meetings and submitted comments regarding the proposed project's impacts on the Las Vegas environment. (AR 05–02072; 32–15683–32–15686; 33–16123; 33–16211–33–16212.) Sierra Club Southern Nevada Group Conservation Committee Co–Chair Margaret Pierce submitted comments regarding the proposed project's potential adverse effects on air quality and urban sprawl, FHWA's use of allegedly inaccurate population forecasts, and FHWA's failure to consider reasonable mass transit alternatives in the EIS. (AR 32–15683–32–15686; 33–16211–33–16212.)

ous nonattainment area for carbon monoxide and particulate matter, increased emissions may lead to further violations of national air quality standards which are set at a level aimed at protecting human health. 42 U.S.C. § 7409(b)(1) (requiring EPA to set NAAQS at a level "requisite to protect the public health"). Sierra Club presented evidence that FHWA's underestimation of population projections and failure to consider factors such as induced travel demand may result in FHWA overestimating the benefits, and underestimating the air quality risks, posed by widening US–95. (AR 31–15184–31–15193; 32–15683–32–15686; 33–16211–33–16212.)

### c. *Redressability*

■■■■ In most procedural injury cases involving environmental analyses, a petitioner "who asserts inadequacy of a government agency's environmental studies . . . need not show that further analysis by the government would result in a different conclusion. It suffices that . . . the [agency's] decision could be influenced by the environmental considerations that [the relevant statute] requires an agency to study." *Public Citizen*, 316 F.3d at 1018–19 (quotation and emphasis omitted). Sierra Club has met this "relatively easy burden." *Id.* at 1019. NEPA contemplates FHWA's decision could be influenced by the environmental considerations NEPA requires governmental agencies to evaluate. *See, e.g.*, 42 U.S.C. § 4332(2)(B). To the extent FHWA has failed to consider various potential environmental effects as alleged by Sierra Club, its decision may be altered by such analyses.

As discussed above, Sierra Club has established its members have suffered injury in fact caused by Defendants' actions that this Court may redress. Consequently, Sierra Club has established Article III standing.

### 2. Organizational Standing

■■■ Sierra Club has standing to bring suit on behalf of its members " 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Public Citizen*, 316 F.3d at 1019 (quoting *Friends of the Earth*, 528 U.S. at 181, 120 S.Ct. 693). Sierra Club adequately has alleged injury to its members. The environmental interests at stake, including air pollution and attendant potential health risks, are pertinent to its interests. *Id.* Finally, resolution of this case does not require participation of Sierra Club's individual members. *Id.*

### 3. APA Standing

■■■ Because NEPA itself authorizes no private right of action, persons aggrieved by an agency's alleged failure to comply with NEPA may seek relief under the APA's provisions for judicial review of agency action. *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988); *see also* 5 U.S.C. § 702. A plaintiff pursuing an action under the APA must meet the APA's statutory requirements for standing. *Public Citizen*, 316 F.3d at 1019. To establish APA standing, Sierra Club must show "(1) that there has been final agency action adversely affecting [it], and (2) that, as a result, it suffers legal wrong or that its injury falls within the 'zone of interests' of the statutory provision [Sierra Club] claims was violated." *Id.* (quotation omitted).

■■■ FHWA issued a ROD approving the US–95 widening project (AR 33–16139), and thus FHWA has taken final agency action. *Or. Natural Res. Council v. Harrell*, 52 F.3d 1499, 1503–04 (9th Cir.

1995) (Army Corps of Engineers' issuance of ROD regarding dam construction was final agency action over which district court had jurisdiction). Sierra Club claims the FHWA has endangered its members and the environment by failing to comply with NEPA. Sierra Club's allegations fit comfortably within NEPA's zone of interests in protecting the environment and state a claim under the APA.

### B. Mootness

■■■■ A case becomes moot whenever it "los[es] its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). In deciding mootness, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." *Cantrell*, 241 F.3d at 678 (quotation omitted).

■■■ Sierra Club's primary concerns with the US–95 widening project involve widening US–95 from six to ten lanes for the five-mile stretch between the I–15/US–95 interchange and the Summerlin Parkway. Most of its criticisms of the EIS and FHWA's failure to prepare a SEIS revolve around this component's potential environmental and health impacts. As of this date, construction on this phase of the US–95 project has not begun. FHWA and NDOT intend to begin the bidding process on widening US–95 from six to ten lanes in April 2004, with construction to begin in June 2004. (Stipulation and Order to Sup-

plement the Administrative R. and to Withdraw Sierra Club's Second Mot. to Supplement the Administrative R., [Doc. # 93] at 3.) Because the Court could enjoin construction of this allegedly most damaging aspect of the overall project, the controversy is not moot. *West v. Sec'y of Dept. of Transp.*, 206 F.3d 920, 925 (9th Cir.2000) (concluding case was not moot even though some highway construction had been completed because the court's remedial powers "would include remanding for additional environmental review and, conceivably, ordering the interchange closed or taken down").[4]

## III. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because NEPA does not contain a separate provision for judicial review, the Court reviews an agency's compliance with NEPA under the APA. *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001). Under the APA, the court bases its decision on a review of the administrative record. 5 U.S.C. § 706. Thus, an APA case generally contains no genuine issues of material fact. *See Bank of Commerce of Laredo v. City Nat. Bank of Laredo*, 484 F.2d 284, 289 (5th Cir.1973) ("when a plaintiff who has no right to a trial *de novo* brings an action to review an administrative record

---

**4.** Sierra Club's claims also are ripe. Sierra Club asserts FHWA violated NEPA's procedural requirements. "[A] person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry*

*Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *see also Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir.2002) ("If there was an injury under NEPA, it occurred when the allegedly inadequate EIS was promulgated.").

which is before the reviewing court, 'the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involve matters of law.' ") (quoting 6 J. Moore, Federal Practice ¶ 56.17[3], at 2472 (1965)); *Buckingham Township v. Wykle*, 157 F.Supp.2d 457, 462 (E.D.Pa. 2001).

▮ Under the APA, the Court may overturn an agency decision under NEPA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts defer to a " 'fully informed and well-considered' agency decision, but [ ] need not forgive a 'clear error of judgment.' " *Churchill*, 276 F.3d at 1071 (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998)).

▮ "NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir.1999) (per curiam) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Because NEPA does not dictate particular results, the Court must not substitute its judgment for that of the agency's, but instead must uphold the agency decision so long as the agency has " 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953–954 (9th Cir.2003) (quoting *Wash. Crab Pro-*

*ducers, Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir.1990)). Nevertheless, the Court strictly interprets the procedural requirements in NEPA and the Council on Environmental Quality's ("CEQ") regulations implementing NEPA consistent with the policies embodied therein; " '[g]rudging, pro forma compliance will not do.' "[5] *Churchill*, 276 F.3d at 1072 (quoting *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir.1974) (en banc)).

## IV. INADEQUATE EIS

▮ "NEPA 'is our basic national charter for protection of the environment.' " *Id.* (quoting *Blue Mountains*, 161 F.3d at 1215). NEPA and CEQ regulations require federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "These actions include projects implemented by non-federal entities that use federal funding." *Tyler v. Cuomo*, 236 F.3d 1124, 1129 (9th Cir.2000).

Title 42 U.S.C. § 4332(2)(C) is "one of the 'action-forcing' provisions intended as a directive to 'all agencies to assure consideration of the environmental impact of their actions in decisionmaking.' " *Kleppe v. Sierra Club*, 427 U.S. 390, 409, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (quoting Conference Report on NEPA, 115 Cong. Rec. 40416 (1969)). Compliance with 42 U.S.C. § 4332(2)(C) ensures federal agencies will consider significant environmental impacts of federal action, make available the relevant information, and open to public scrutiny their decision making process. *Churchill*, 276 F.3d at 1072–73. "NEPA also emphasizes the importance of coherent

---

**5.** The CEQ is a body established by NEPA, 42 U.S.C. §§ 4342–4347, which has issued regulations implementing NEPA. CEQ regulations, 40 C.F.R. § 1500 *et seq.*, are entitled to "sub-

stantial deference." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* (quotation omitted).

■■■■ The Court applies a "rule of reason" standard when reviewing the adequacy of an agency's EIS. *Id.* at 1071. Under this standard, the Court asks "'whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Id.* (quoting *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974)). The Court "makes 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" *Id.* (quoting *Trout Unlimited,* 509 F.2d at 1283). Review under the rule of reason and for abuse of discretion "are essentially the same." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1376 (9th Cir.1998).

Sierra Club argues the EIS for the US–95 widening project is inadequate for four reasons: (1) the EIS did not adequately identify and study the direct, indirect, and cumulative impacts of the project; (2) the EIS relied on inaccurate information; (3) the EIS failed to identify and analyze all reasonable alternatives; and (4) FHWA inadequately responded to comments by EPA and the public. (Compl.¶¶ 117–18, 120–121, 124–26, 129–131.) The Court will address each of these arguments to determine whether the alleged deficiencies, or a combination of deficiencies, are sufficient to warrant holding the EIS legally inadequate. *Churchill,* 276 F.3d at 1071.

### A. Inadequate Impacts Analysis (Count 1)

#### 1. Induced Growth

■■■ Sierra Club argues the FEIS failed to adequately discuss the proposed project's potential to induce growth in the northwest region of Las Vegas. The FEIS discussed at length land use and zoning issues. (AR 30–14661–30–14709.) The FEIS discussed existing plans for master planned communities and other land uses in the area. (AR 30–14661–30–14670.) The FEIS also explored city and county growth plans and zoning regulations and patterns. (AR 30–14670–30–14694.) In addition to identifying current and anticipated land use and zoning, the FEIS discussed direct and indirect impacts from the proposed project, including "induced" or "accelerated development impacts." (AR 31–14815–31–14820.)

Mere disagreement with the FEIS's substantive conclusions regarding the proposed project's impacts on induced growth is not a basis for overturning an agency decision under NEPA and the APA. *See Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 561 (9th Cir.2000) (noting that even if a court disagrees with an agency decision, the court cannot substitute its judgment for that of the agency). Rather, the Court must decide whether the agency has taken the requisite "hard look" at the environmental impacts of the proposed project. *Muckleshoot Indian Tribe,* 177 F.3d at 814. The Court finds that the FEIS's discussion of induced and accelerated growth impacts was reasonably thorough.

#### 2. Induced Travel

■■■ Sierra Club next argues the FEIS did not adequately address induced travel. According to various studies, increased highway capacity attracts increased levels of vehicle traffic. (AR 34–16582; 34–16627; 34–16646.) Induced travel occurs when the supply of available highway space lowers the cost of travel, particularly

in terms of time, thereby inducing travelers to take trips they otherwise would not take because of the concomitant costs. (AR 34–16585.) Failure to account for induced travel when making transportation decisions may lead agencies to select projects which provide no relief from congestion combined with increased adverse impacts to air quality. (AR 34–16599–34–16603; 34–16635; 34–16662–34–16663.)

According to FHWA, the traffic forecasting model used in the EIS, TRANPLAN, accounted for most induced travel impacts, such as route changes and changes in the time of day trips are taken. FHWA concedes some induced travel impacts remain unaccounted for in the FEIS: "It is only new trips made in direct response to a perceived reduction in congestion that is not accounted for by TRANPLAN." (Fed. Defs.' Reply in Supp. of Mot. for Summ. J. at 6.) FHWA contends the portion of induced travel for which TRANPLAN does not account is "an indeterminate, but relatively small, component" of induced travel effects and that current models cannot accurately capture this phenomenon. (*Id.*)

The FEIS includes within its calculations most induced travel effects, but it does not explicitly mention induced travel, nor does it explain that its traffic forecasting model accounts for some, but not all, induced travel impacts. Furthermore, even if the portion of induced travel for which TRANPLAN does not account is small, the FEIS states that even "minor changes in forecast traffic distributions . . and other model inputs could result in differences in predicted [carbon monoxide] concentrations." (AR 32–15259.) Thus, even a small impact from the unaccounted for induced travel could result in increased carbon monoxide emissions. Because EPA has designated Las Vegas as a serious nonattainment area for carbon monox-

ide, failure to account for such impacts may underestimate the environmental and attendant health impacts associated with the proposed project.

Nevertheless, the Court finds the FEIS's treatment of induced travel effects is a reasonably thorough analysis. The FEIS considered nearly all induced travel effects. The portion not considered is the subject of scientific debate, and current models vary in their calculations to quantify induced travel effects. (AR 34–16580–34–16624; 34–16625–34–16641; 34–16643–34–16676; 34–16704.) As the EPA recognized in its comments on the DEIS, "the tools to analyze induced travel are not fully developed at this time." (AR 31–15191 [requesting FHWA perform a "preliminary assessment" of induced travel impacts for the proposed project].). Consequently, FHWA included a reasonably thorough evaluation of induced travel effects based on the information and modeling techniques available to the agency at that time.

The Court finds that even if the FEIS's discussion of induced travel impacts was not reasonably thorough, the Court finds the scope of that failure insufficient to render the entire FEIS inadequate. Given the significant environmental and air quality improvements between the proposed project and the "no build" alternative, the FEIS's omission of this fraction of potential induced travel effects, which could be ascertained, if at all, only through uncertain modeling techniques, did not preclude informed decision-making and informed public participation in this instance.

### 3. Adverse Health Impacts

Sierra Club next argues the EIS failed to fully analyze the proposed project's effects on air quality and health. In particular, Sierra Club argues the EIS

should have evaluated health effects from mobile source air toxics ("MSAT") and fine particulate matter ($PM_{2.5}$).

As to MSATs, the Court concludes this issue is addressed more appropriately under Sierra Club's claim FHWA violated NEPA by failing to prepare a SEIS in response to new information. When the FEIS was issued, EPA had not identified MSATs as a health risk nor assigned a unit risk factor for MSATs. Not until March 2001 did EPA publish a rule identifying MSATs and characterizing them as known or suspected carcinogens. *See Control of Emissions of Hazardous Air Pollutants From Mobile Sources*, 66 Fed. Reg. 17230 (Mar. 29, 2001). In addition to EPA's recent formal statement on the subject, Sierra Club has identified recently published studies suggesting a link between MSATs and cancer. Because the MSAT issue appears to revolve around new information developed after the FEIS, the Court will review Sierra Club's MSAT claim under Count 5, failure to prepare a SEIS.

In contrast, the FEIS acknowledged EPA had issued NAAQS guidelines for $PM_{2.5}$. (AR 30–14724.) But the FEIS declined to analyze $PM_{2.5}$ impacts because EPA had not yet designated Las Vegas as a nonattainment area. (*Id.*) According to FHWA, because the EPA had not completed background monitoring and had not designated Las Vegas a nonattainment area, the EIS did not need to evaluate $PM_{2.5}$ impacts.

FHWA's decision not to further study the effects of $PM_{2.5}$ on a project specific scale was not arbitrary and capricious. At the time of the ROD in January 2000, EPA had not completed background monitoring in Las Vegas, had not designated Las Vegas as a nonattainment area for $PM_{2.5}$, had not identified approved modeling techniques for $PM_{2.5}$, and had not issued guidance on implementing the $PM_{2.5}$ NAAQS. Not until April 2003 did EPA issue regulations advising agencies on models available to use for $PM_{2.5}$ evaluations. *See* 40 C.F.R. Pt. 51, App. W, 68 Fed.Reg. 18448 (Apr. 15, 2003). And only as of February 2004 has EPA issued policy guidance on the MOBILE6.2 model for modeling $PM_{2.5}$. *See* http://www.epa.gov/otaq/models/mobile6/mobil6.2_letter.pdf. at 1 (EPA policy guidance on MOBILE6.2 model). Even this guidance is only for state implementation plan and conformity analyses, not NEPA evaluations of project-specific impacts. (*Id.*) As of this date, EPA still has not classified Las Vegas as a nonattainment area for $PM_{2.5}$. EPA also "has not yet finalized implementation policy for the $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS)." *Id.* at 11.

FHWA does not act arbitrarily and capriciously by not evaluating a project-specific impact for which the then-current scientific modeling and available information could not provide meaningful findings on which to base a decision. *See Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1286 (1st Cir.1996) ("An environmental effect would be considered 'too speculative' for inclusion in the EIS if it cannot be described at the time the EIS is drafted with sufficient specificity to make its consideration useful to a reasonable decisionmaker."). The Court therefore will grant summary judgment on Count 1 in favor of Defendants.[6]

---

**6.** In its Complaint, Sierra Club also claimed the EIS failed to adequately examine social and fuel costs during construction. (Compl.¶ 118(e).) Sierra Club "has elected not to pursue [this] allegation ...." (Pl.'s Response to Defs.' Mot. for Summ. J. at 39 n. 9.) Consequently, the Court will grant summary judgment in favor of Defendants on this issue.

## B. Reliance on Inaccurate Information (Count 2)

Sierra Club next argues the EIS relied on inaccurate population and traffic forecasts in performing modeling and projection analyses.[7] In commenting on the DEIS, the EPA noted "growth projections have historically been grossly underestimated," and "[s]mall changes in model assumptions would easily eliminate the projected air quality benefits." (AR 30–14264; 30–14268.) During the various MIS and EIS comment periods, citizens and Sierra Club also questioned FHWA's reliance on population forecasts well below other state agencies' projections. (AR 09–04308; 09–04325–09–04326; 32–15684; 33–16215; 34–16447.) FHWA responded that it was relying on the RTC's population and traffic forecasting in the RTC's modeling program TRANPLAN. (AR 32–15247.)

FHWA's reliance on the RTC's population and traffic forecasts was not arbitrary or capricious. 5 U.S.C. § 706(2)(A). The RTC is the designated metropolitan planning organization ("MPO") for the Las Vegas area. 23 U.S.C. § 134(b). As the MPO, the RTC is responsible for developing transportation plans "to encourage and promote the safe and efficient management, operation, and development of surface transportation systems that will serve the mobility needs of people and freight and foster economic growth and development within and through urbanized areas, while minimizing transportation-related fuel consumption and air pollution." *Id.* § 134(a)(1). The RTC also is responsible for developing a transportation improvement plan, which must be updated at least every two years. 23 C.F.R. § 450.324. To carry out these responsibilities, the RTC uses TRANPLAN, a traffic forecasting model. (AR 32–15247.) TRANPLAN is updated as new information on population, land use, and other information becomes available. (*Id.*)

RTC is a government entity charged with developing transportation plans based on forecasted needs in the area. Although some citizen and agency comments suggested RTC historically underestimates growth, FHWA's reliance on figures produced by a state governmental entity statutorily charged with developing state transportation plans based on projected need is not arbitrary or capricious. *See Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1464–65 (9th Cir.1984) (FHWA reasonably relied on older population projections despite updates where EIS examined a range of populations and explained reasons for selecting population projections used in EIS); *Piedmont Heights Civic Club, Inc.*

---

7. In its Complaint, Sierra Club also asserted the EIS utilized a "flawed carbon monoxide (CO) model." (Compl.¶ 122.) Sierra Club has not pressed this claim nor explained why the model is flawed. Rather, Sierra Club's consistent argument has been that the data input into the model, rather than the model itself, was flawed, inaccurate, and unreliable. To the extent Sierra Club still seeks to assert this claim, the Court grants partial summary judgment in favor of Defendants on this point. FHWA used the EPA-approved MOBILE5a_h emissions model to predict emission rates. (AR 25–12080–25–12081.) Emission rates generated by this model were then used as inputs into the California Department of Transportation's CAL3QHC (version 2) dispersion model to estimate carbon monoxide dispersion. (*Id.*) The Court will not second guess FHWA's choice of the appropriate scientific methodology, particularly where other government agencies have approved these models. *See Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1185 (9th Cir.2000) ("Even if the agency's tools are 'primitive,' ... the decision not to employ a different methodology or particular empirical studies does not suffice to show arbitrary or capricious action."); *Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 526 (9th Cir.1994) ("NEPA does not require us to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among various experts.").

*v. Moreland,* 637 F.2d 430, 442 (5th Cir. 1981) (upholding EIS's reliance on disputed population projections because population projection is uncertain and "a conflicting projection does not prove the invalidity of another projection"). Consequently, the Court will grant summary judgment in favor of Defendants on Count 2.

## C. Inadequate Alternatives Analysis (Count 3)

Sierra Club next argues the EIS failed to consider all reasonable alternatives. Specifically, Sierra Club questions FHWA's decision to omit a fixed guideway alternative from the alternatives analysis. FHWA responds that the EIS did not need to consider a fixed guideway alternative because the MIS process properly rejected that alternative. FHWA also argues Sierra Club waived this claim. (Fed. Defs.' Response to Pl.'s Mot. For Summ. J. at 15 n. 6.) This Court previously denied Defendants' motion to dismiss Sierra Club's Complaint based on laches. *Sierra Club v. U.S. Dept. of Transp.,* 245 F.Supp.2d 1109 (D.Nev.2003). Defendants nevertheless argue Sierra Club's claim regarding the fixed guideway should be dismissed because the factors that led this Court to deny the motion do not apply to the fixed guideway claim.

Whether the EIS failed to consider a reasonable alternative should have been apparent to Sierra Club at the time the EIS was issued. Sierra Club's failure to challenge this aspect of the EIS until over two years after the ROD is troubling. Sierra Club contends that the studies it commissioned could inform and affect the weighing of alternatives by making a fixed guideway a more compelling alternative once all environmental impacts are taken into consideration. Sierra Club also appears to argue, however, that even in the absence of these later studies, the EIS

improperly failed to consider a reasonable alternative from the outset. Although the Court rejects Sierra Club's argument that FHWA's decision to omit a fixed guideway alternative from the alternatives analysis renders the EIS inadequate, the Court also is persuaded that at this late stage of the highway construction process, Sierra Club's arguments in this regard should not be given much weight because Sierra Club failed to specifically seek relief on this particular ground at the time these proceedings were initiated.

The MIS process, which preceded the EIS, considered three basic alternatives, the US–95 Improvement Strategy, the Desert Inn/Rainbow Super Arterial Strategy, and the Fixed Guideway Strategy. Each alternative consisted of numerous projects aimed at improving mobility and increasing transportation capacity.

The US–95 Improvement Strategy proposed widening US–95 from six to ten lanes from Rainbow Boulevard to the I–15/US–95 interchange. (AR 02–00930.) The Strategy also proposed widening US–95 from four to six lanes from Craig Road to Rainbow Boulevard. (*Id.*) Additionally, the Strategy proposed widening Summerlin Parkway to six lanes. (*Id.*) The MIS estimated widening the freeway would create additional capacity of 12,000 person trips per hour. (AR 02–00963.) In conjunction with other strategies such as bus service, HOV lanes, arterial street improvements, a freeway management system, and transportation demand management measures, the MIS projected the US–95 Improvement Strategy would accommodate 30,000 additional person trips per hour. (AR 03–01092.) The MIS estimated overall costs ranging from approximately $440 million to $446 million depending on whether the freeway was expanded to the north or south. (AR 03–01097.) The report also considered double decking

US–95 to achieve the same capacity as widening but at an estimated cost of $786 million. (*Id.*) Although fewer homes would have to be taken, existing homes would suffer visual and noise impacts, and construction on the freeway would be impacted significantly.[8] (AR 02–00967.)

The Rainbow/Desert Inn Super Arterial Strategy proposed creating super arterial corridors along Rainbow Boulevard and Desert Inn Road. (AR 02–00984.) This alternative would provide additional estimated capacity of approximately 7,800 person trips per hour. (AR 03–01002.) In conjunction with arterial street improvements, enhanced bus service, a freeway management system, and transportation demand management measures, the Super Arterial Strategy would provide 28,800 additional person trips per hour. (AR 03–01103.) At an estimated cost of about $677 million, the Super Arterial Strategy would result in a large number of takings as well as relocation of parking at Cashman Middle School. (AR 03–01103; 03–01105–03–01106.)

The Fixed Guideway Strategy proposed constructing a fixed guideway system, such as elevated light rail, from the Resort Corridor to various points in the northwest. (AR 03–01003.) To be effective, a fixed guideway in the northwest would need to connect to a fixed guideway system providing trips internally within the Resort Corridor. (*Id.*) At the time of the MIS, the RTC had adopted a conceptual plan for a fixed guideway in the Resort Corridor as the locally preferred alternative following a separate Major Investment Study conducted for the Resort Corridor. (*Id.*) The MIS considered three alternative routes for the fixed guideway alignments into the

northwest. (AR 03–01003–03–01024.) The MIS expected the fixed guideway would generate demand of 5,000 riders per hour during the peak hours. (AR 03–01024.) Although estimating a demand of only 5,000 riders per hour, the MIS determined the fixed guideway's capacity could be much greater:

> The system capacity would be substantially greater than the capacity required to accommodate peak hour demand. By adding more trains to the system, the total capacity of the system could be increased to meet travel demands beyond the year 2015. For example, 25 trains operating at 2½ minute intervals would be able to accommodate nearly 18,000 passengers per hour in the peak direction. Therefore, it may be concluded that the Fixed Guideway System would be able to accommodate future travel demand way beyond the 20 year planning horizon.

(AR 03–01024.) In conjunction with enhanced bus service, arterial street improvements, a freeway management system, and transportation demand management measures, the MIS projected the Fixed Guideway Strategy would result in an additional 26,000 person trips per hour. (AR 03–01099.) The report estimated the Fixed Guideway Strategy would cost $770 to $834 million depending on the chosen alignment. (*Id.*)

In addition to evaluating capacity, benefits, and cost, the MIS conducted a "preliminary environmental screening." The MIS makes clear, however, that it "does not provide a detailed analysis of potential environmental impacts from each alternative," and "is intended for comparison pur-

---

8. The MIS also considered strategies such as transportation demand management, freeway management systems, and enhanced bus service. (AR 02–00977–02–00984.) Because these strategies are common to all of the alternatives and because Sierra Club does not challenge these strategies, the Court does not discuss them in detail.

poses only." (AR 03–01106.) The MIS also states elements "common to all strategies, such as arterial street improvements, were not examined since they will be assessed in subsequent environmental documentation." (*Id.*)

The preliminary environmental screening compared each strategy as it would impact natural resources; cultural resources; parks, schools, and recreational facilities; air quality; noise; aesthetics; and hazardous materials. (AR 03–01106–03–01113.) The MIS estimated that by the year 2015, the US–95 Improvements Strategy would reduce carbon monoxide emissions by up to 235 tons per year, the Super Arterial Strategy by up to 549 tons per year, and the Fixed Guideway Strategy by up to 2,978 tons per year. (AR 03–01111.) The MIS also projected that by 2015, the US–95 Improvements Strategy would reduce vehicle miles traveled by approximately 9.4 million, the Super Arterial Strategy by about 21 million, and the Fixed Guideway Strategy by approximately 119 million. (*Id.*)

Following a comparison of these alternatives, the MIS approved a locally preferred alternative consisting of a modified version of the US–95 Improvements Strategy. (AR 03–01124.) The locally preferred alternative consisted of widening US–95, implementing a freeway management system, improving arterial street connections, adopting enhanced bus service, and employing transportation demand management measures. (*Id.*) The MIS rejected the Super Arterial Strategy because of its "relatively high cost for limited increased capacity and the high level of impacts ...." (AR 03–01130.) The MIS rejected the Fixed Guideway Strategy because it did not meet the project's purpose and need, was too costly, and was dependent upon a fixed guideway in the Resort Corri-

dor, the construction of which was uncertain at that time. (AR 03–01130.)

The EIS ultimately did not consider either the Super Arterial or Fixed Guideway Strategies. Instead, it considered two alternatives that would widen US–95 and the "no-build" alternative.

NEPA requires the EIS to discuss alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii). CEQ regulations describe the alternatives analysis as "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. The alternatives analysis "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* § 1502.14(a).

"Project alternatives derive from an Environmental Impact Statement's 'Purpose and Need' section, which briefly defines 'the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.'" *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997) (quoting 40 C.F.R. § 1502.13). Thus the stated goal of a project dictates the range of "reasonable" alternatives. *Id.* Because the purpose and need defines the range of alternatives, an agency "cannot define its objectives in unreasonably narrow terms." *Id.*

 Although an agency must consider all reasonable alternatives, the agency need not include "'every alternative device and thought conceivable.'" *Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 525 (9th Cir.1994) (quoting *Vermont*

*Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (internal quotation omitted)). The range of alternatives is " 'bounded by some notion of feasibility.' " *Id.* at 524, 98 S.Ct. 1197 (quoting *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. 1197). Neither NEPA nor its implementing regulations require an EIS to discuss a minimum number of alternatives. *Id.*

CEQ regulations mandate federal and state cooperation "to the fullest extent possible to reduce duplication between NEPA and State and local requirements, including joint planning, environmental research and studies, public hearings, and environmental assessments." 40 C.F.R. § 1506.2(b). Accordingly, a federal agency does not violate NEPA by relying on prior studies and analyses performed by local and state agencies. *See Laguna Greenbelt*, 42 F.3d at 524 n. 6 ("[T]he absence of a more thorough discussion in the EIS of alternatives that were discussed in and rejected as a result of prior state studies does not violate NEPA."); *see also North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542–43 (11th Cir.1990) (finding federal reliance on state and local assistance in NEPA process was not arbitrary and capricious).

■ FHWA's reliance on the MIS process to eliminate alternatives from the EIS was not arbitrary and capricious. The EIS did not consider in depth a fixed guideway alternative because the MIS process evaluated that alternative and found it did not meet the project's purpose and need, was too costly, and depended upon an uncertain RCFG. The MIS contained many of the hallmarks of the NEPA process, including various studies on project impacts, significant public involvement, and a comparison of alternatives. (AR 01–00050; 01–00048–01–00113; 01–00117–01–

00142; 01–00184–01–00419; 01–00420–02–00776; 04–01651–04–02033; 05–02034–05–02458 (scientific studies); AR 01–00184–01–00419, 01–00420–02–00776, 04–01651–04–02033, 05–02034–05–02458 (public involvement); AR 03–01092–03–01117 (comparison of alternatives).) FHWA's decision not to duplicate the state agencies' analyses and evaluations as to what alternatives would be feasible and meet project goals does not violate NEPA.

Sierra Club's reliance on *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir.2002) to argue FHWA cannot rely on state processes is misplaced. *Kern* did not involve a federal agency's reliance on prior state activities. *Kern* involved "tiering," a method by which a site specific EIS prepared within a broad program need only summarize and incorporate by reference the issues discussed in the broader statement. *Id.* at 1073. CEQ regulations expressly permit tiering "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. While the regulations encourage tiering, an agency may not tier to a document that has not itself been subject to NEPA review. *Kern*, 284 F.3d at 1073. Consequently, *Kern* held that "[a]lthough CEQ procedures allow agencies to incorporate by reference certain materials to cut down on the bulk of an EIS, they cannot 'tier' their site-specific EISs to [a] broader [] program where the program itself has not been subject to NEPA procedures." *Id.*

*Kern* does not prohibit federal agencies from relying on state precursor activities to a site specific EIS. Indeed, CEQ regulations mandate such cooperation to reduce duplicative efforts between state and federal agencies. Because FHWA's reliance on the MIS was not arbitrary and capri-

cious, the Court will grant summary judgment in favor of Defendants on Count 3.

### D. Inadequate Response to Public Comments (Count 4)

Sierra Club asserts FHWA failed to respond adequately to public and EPA comments on: (1) the proposed project's ability to meet project goals; (2) induced travel impacts; and (3) public health risks created by the project. (Compl.¶¶ 1129–131.)

CEQ regulations require a federal agency preparing a FEIS to "assess and consider comments both individually and collectively, and [ ] respond" to those comments in the FEIS. 40 C.F.R. § 1503.4. The agency may respond by modifying alternatives included in the proposed action; developing and evaluating alternatives not previously considered in depth; supplementing, improving, or modifying its analyses; making factual corrections; and/or explaining "why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicat[ing] those circumstances which would trigger agency reappraisal or further response." *Id.*

 An agency need not publish every comment in the FEIS, but an agency must provide a " 'meaningful reference' to all responsible opposing viewpoints concerning the agency's proposed decision." *State of Cal. v. Block,* 690 F.2d 753, 773 (9th Cir.1982) (quoting 40 C.F.R. § 1510(a) (1977)). An agency "is under no obligation to conduct new studies in response to issues raised in the comments, nor is it duty-bound to resolve conflicts raised by opposing viewpoints." *Id.* But the agency must provide a " 'good faith, reasoned analysis in response.' " *Id.* (quoting *Silva v. Lynn,* 482 F.2d 1282, 1285 (1st Cir.1973)).

### 1. Ability to Meet Project Goals

 During the MIS and EIS process, members of the public commented that widening US–95 would not meet the project's goals because the freeway would be congested upon completion or soon thereafter.[9] Citizen Alert and Sierra Club also raised this specific concern in comment letters on the DEIS. (AR 32–15661; 32–15684.)

EPA also apparently was concerned with this issue. Before submitting its official comments, EPA questioned what level of service widening the freeway would provide, and how long that relief would last. (AR 29–14019.) In its official comments on the DEIS, EPA "question[ed] the conclusion that the proposed project will ... meet intermediate and long-range transportation needs." (AR 31–15185.) EPA requested the FEIS "clearly describe the level of congestion relief ... achieved and how long this relief will last by widening U.S. 95." (AR 31–15191.) In commenting on the FEIS, EPA again noted "[t]here has also been significant debate regarding the length of time U.S. 95/Summerlin Parkway widening will actually reduce congestion." (AR 33–16228.)

FHWA responded to these comments by stating that widening US–95 would improve the congestion level compared to the no-build alternative, and the proposed project would meet travel demands through the year 2020. (AR 32–15246–32–15427.)

---

9. Citizens commented at the June 9 and 10, 1999 public hearings that the widening project will be "obsolete" soon after completion. (AR 32–15316–32–15317; 32–15360.) Other citizens asserted they heard NDOT employee Kent Cooper previously state that the widened US–95 would remain uncongested for only two years after completion. (AR 26–12323.) Cooper was present at a meeting during which these allegations were reiterated, and he did not contradict the allegations. (AR 26–12309–26–12340.)

Transportation plans typically extend for twenty years. *See* 23 C.F.R. § 450.322. Although not a model of agency responsiveness, FHWA's response was sufficient to explain the freeway widening met project goals of reducing congestion and improving transportation mobility for the planning period.

### 2. Induced Travel

During the MIS and EIS process, members of the public, environmental groups, and EPA commented that the EIS did not evaluate the potential effects of induced travel on the costs and benefits of the proposed widening project. EPA commented that "[a] growing body of evidence suggests that additional highway capacity does not simply relieve congestion at fixed levels of usage, but generates additional travel as well." (AR 30–14264; 30–14269–14270.) EPA cited a 1995 report, "Expanding Metropolitan Highways: Implications for Air Quality and Energy Use," in which the Transportation Research Board concluded that "[t]he evidence from studies reviewed here supports the view that highway capacity additions can induce new trips, longer trips, and diversions from transit." (AR 30–14270.) EPA also cited a 1998 study by the Surface Transportation Policy Project analyzing over fifteen years' worth of congestion data compiled by the Texas Transportation Institute. (*Id.*) This study found that "metro areas that invested heavily in road capacity expansion fared no better in easing congestion than metro areas that did not." (*Id.*) The report mentioned "dozens of traffic studies" that have found additional highway capacity induces additional travel. (*Id.*) One such study by "UC Berkeley researchers Mark Hansen and Yuanlin Huang, found that at the metropolitan level, every 1% increase in new lane-miles generated a 0.9% increase in traffic in less than five years, which led them to conclude

that 'With so much induced demand, adding road capacity does little to reduce congestion.'" (*Id.*)

EPA conceded that the "tools to analyze induced travel are not fully developed at this time," but the agency urged FHWA to conduct "at least a preliminary assessment of this phenomenon in the context of this project." (*Id.*) EPA warned that failure to account for induced travel in the modeling assumptions could lead to underestimating the adverse impacts of the project on congestion and air quality and erroneously conclude that the project would result in a net benefit. (AR 30–14668–30–14670; 34–16599–34–16603; 34–16635; 34–16662–34–16663.) EPA reiterated its concerns about induced travel in its comments on the FEIS. (AR 33–16228.)

FHWA's response to EPA's comments to the DEIS discussed induced *growth* (development of land that otherwise would not have been developed, or would have been developed at a slower pace, induced by increased highway access), rather than induced *travel* (trips that otherwise would not have been taken induced by increased highway capacity):

> While recent studies may indicate that roadway expansion induces growth, induced growth would have to exceed the growth projected in existing Master Plans to exceed the capacity of the transportation system in the projected area with the proposed project. Currently, there is no basis to project growth beyond that in the Master Plans.

(AR 32–15253.) FHWA makes no further response to the studies cited by EPA, nor does it discuss in any fashion the concept of induced travel. In response to EPA's comments on the FEIS, FHWA recognized EPA had "requested a preliminary assessment of induced travel in the context of this project." (AR 34–16416.) Despite

recognizing that EPA was concerned about induced travel, FHWA once again responded with an induced growth analysis:

This project ... is viewed as [ ] responsive to growth rather than as inductive to growth. The proposed project ... [is] not considered as an inducement to growth because [it] provide[s] the capacity required to meet demand but do[es] not provide any excess capacity. Since the proposed project will not provide capacity which is greater than demand, it does not create incentives which are greater than currently exist. While it can be argued that all growth is induced, current growth inducement is related to the favorable economic climate and other socioeconomic and quality of life factors and not to roadway capacity.

(AR 34–16416.) Not until Sierra Club's first request for a SEIS did FHWA finally attempt to address, in some manner, induced travel as opposed to induced growth. (AR 34–16704–34–16705.)

Because FHWA continuously confused the concepts of induced growth and induced travel in its responses to comments, it did not clearly respond to EPA's concerns about induced travel. Consequently, FHWA did not "[s]upplement, improve, or modify its analyses" nor "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response." 40 C.F.R. § 1503.4.

Although FHWA's response to comments regarding induced travel were inadequate, this failure is not enough to render the entire EIS inadequate. As discussed previously, the FEIS incorporated nearly all induced travel impacts within its analyses. The agency's awkward responses to the induced travel comments are not so faulty that the EIS must be reworked simply to respond to these comments. FHWA since has explained its position more fully. (AR 34–16704–34–16705.) It would exalt form over substance to require FHWA to suspend all progress on the proposed project simply to reiterate its position.

### 3. Public Health Risks

During the MIS process, several members of the public expressed concern over health impacts to those living, working, recreating, and traveling in the project area. (AR 23–11193–23–11194; 23–11217–23–11218; 16–07888–16–07889; 17–08107; 04–01630–04–01639; 04–01708; 04–01732; 05–02460–05–02461.) FHWA responded to comments about potential health impacts by noting that the proposed project was expected to reduce the number and severity of NAAQS violations for carbon monoxide. (AR 33–15786.) Because the NAAQS standards are set at a level to protect human health, this response is sufficient. As to $PM_{10}$, FHWA asserted that potential $PM_{10}$ pollution would be greatest during construction, but adopted a detailed mitigation plan. (AR 31–14878–31–14881.) This response also is sufficient.

To the extent Sierra Club asserts FHWA did not respond to comments about MSATs and their attendant health risks, the Court agrees with FHWA that this issue properly is part of the inquiry into whether FHWA violated NEPA when it refused to prepare a SEIS based on new information on the impacts of MSATs. Indeed, Sierra Club cites studies on MSATs as "new information" requiring FHWA to prepare a SEIS.

Consequently, the Court will grant summary judgment in favor of Defendants on Count 4.

## V. FAILURE TO PREPARE A SEIS (Count 5)

Sierra Club next argues FHWA violated NEPA by failing to prepare a SEIS in response to Sierra Club's two requests that FHWA do so. Sierra Club contends FHWA was required to prepare a SEIS to examine the significant impacts associated with induced travel and health effects from air pollutants based on various studies Sierra Club submitted to FHWA.[10] (Compl.¶¶ 134–135.)

 "An action to compel an agency to prepare a SEIS is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1), to compel agency action unlawfully withheld or unreasonably delayed." *Friends of the Clearwater*, 222 F.3d at 560 (quotation omitted). "In such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Id.* A court should not set aside an agency's decision not to prepare a SEIS unless it was arbitrary or capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The reviewing court considers "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Friends of the Clearwater*, 222 F.3d at 556 (quoting *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851). Just as with a review of an original EIS, the court does not substitute its judgment for that of the agency. *Id.*

 "NEPA imposes on federal agencies a continuing duty to supplement existing ... EISs in response to 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 n. 2 (9th Cir. 2000) (quoting 40 C.F.R. § 1502.9(c)(1)(ii)); *see also Laguna Greenbelt, Inc.*, 42 F.3d at 529; 23 C.F.R. § 771.130(a) (FHWA regulations requiring SEIS in response to new information or circumstances). Thus, an agency "cannot simply rest on the original document." *Friends of the Clearwater*, 222 F.3d at 557. Rather, it must "continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" *Id.* (quoting *Marsh*, 490 U.S. at 374, 109 S.Ct. 1851).

> [T]he decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Marsh*, 490 U.S. at 374, 109 S.Ct. 1851 (quoting 42 U.S.C. § 4332(2)(C)). When confronted with Sierra Club's requests to prepare a SEIS, FHWA was required to evaluate the new information and determine whether or not it was of sufficient significance to require a SEIS. *Friends of the Clearwater*, 222 F.3d at 558. If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. *Marsh*, 490 U.S. at 376–78, 109 S.Ct. 1851.

10. Sierra Club also asserted in its Complaint FHWA must prepare a SEIS using accurate traffic projections. (Compl.¶ 136.) As discussed in part IV.B., FHWA's reliance on the RTC's traffic projections was not arbitrary and capricious.

### A. Mobile Source Air Toxics (MSATs)

After FHWA issued its ROD, Sierra Club requested that FHWA prepare a SEIS based on new information regarding health risks from MSATs. Sierra Club's new information consisted of two studies. The first was a March 2000 study entitled "The Multiple Air Toxics Exposure Study" ("MATES–II"), which was conducted by the South Coast Air Quality Management District in California. (AR 34–16646.) This study conducted an air toxic evaluation program in the Los Angeles basin area which included air toxic monitoring, an updated emissions inventory of air toxics, and modeling to characterize risks. (AR 34–16448–34–16566.) MATES–II monitored over thirty pollutants at ten fixed and fourteen variable sites throughout the basin. (AR 34–16459.) Using California risk factors to assign cancer risks to various emission levels, the study placed the carcinogenic risk from MSATs in the region at 1,400 per one million people. (AR 34–16459; 34–16461.) The study assigned seventy percent of that risk to diesel particulate emissions, twenty percent to other mobile sources (cars, trucks, etc.), and ten percent to stationary sources (businesses such as dry cleaners or chrome plating operations). (Id.) The difference in carcinogenic risk from one monitored site to another depended more on exposure to increased mobile source emissions than from stationary sources. (AR 34–16463.) The study noted, however, that currently no method existed to reliably measure diesel particulates, and the determination of cancer risk values for MSATs was uncertain and controversial. (AR 34–16465.)

The second study, "Distance Weighted Traffic Density in Proximity to a Home is a Risk Factor for Leukemia and Other Childhood Cancers" ("Leukemia Study"), was published in the February 2000 issue of the Journal of the Air and Waste Management Association. (AR 34–16446; AR 34–16567–34–16579.) This study used data from an earlier Denver cancer study, identified nearby high traffic streets, and obtained traffic density data from the relevant time frame of the prior study. (AR 34–16567.) The Leukemia Study concluded a link existed between proximity to high density traffic roadways with over twenty thousand vehicles per day and childhood cancers and leukemia. (Id.)

FHWA denied Sierra Club's request for a SEIS. FHWA commented that the MATES–II study found a pronounced decrease in toxics levels from 1990 to 1997, and that the risk associated with air toxics has decreased by fifty percent. (Id.) FHWA also noted that MATES–II used elemental carbon as a surrogate for measuring diesel particulate matter because no current reliable method exists to measure diesel particulate matter. (AR 34–16703.) Additionally, FHWA mentioned that EPA had not declared diesel particulate a toxic air contaminant. (Id.) Because a significant portion of the MATES–II study risk factor came from diesel particulates, a matter EPA had not yet classified as a toxic air contaminant, FHWA concluded the MATES–II study "may not be relevant outside California."[11] (Id.) FHWA also explained that EPA was developing a National Urban Air Toxics Strategy which "may lead to more promising research and analytical methods." (Id.) Additionally, FHWA cited various indications that MSAT emissions have been decreasing due to stricter emissions controls and cleaner burning fuels. (AR 34–16703–34–16704.) In summary, FHWA concluded:

11. The California Environmental Protection Agency assigned a cancer risk level for diesel particulate matter at three hundred in a million per microgram per cubic meter of diesel particulates. (AR 34–16465.)

Based on the evaluation of available research on air toxics and associated risks associated with the expansion of US–95, we believe it is not possible to confidently estimate air toxics impact. It is encouraging to note that there are programs underway which are significantly reducing air toxics from the vehicle fleet. In general, because the project will relieve traffic congestion and will encourage alternative modes of transportation, there should be an extremely small, but indeterminate benefit from the project. Because the project will result in widening the US–95 freeway and will move traffic closer to potential receptors, there potentially may be no impact over existing conditions or an extremely small, but indeterminate adverse impact as a result of the project. In general, we believe that the US–95 project provides a net benefit in regard to air toxics.

(AR 34–16704.)

In response to FHWA's denial of its request, Sierra Club commissioned two studies to evaluate health and air quality impacts from the US–95 widening project. Sierra Club forwarded these studies to FHWA and again requested the agency prepare a SEIS. (AR 35–16734.)

In the first study ("RSG Study"), Sierra Club commissioned Resource Systems Group to estimate air toxic exposure by modeling motor vehicle emissions using the traffic forecasts prepared by the RTC. (AR 35–16743; 35–16757–35–15763.) The study utilized traffic volumes and corresponding toxic exposure estimates from MATES–II to estimate air toxic exposures for the US–95 corridor. (AR 35–16727–35–15763.) The RSG study concluded that "the proposed expansion of the highway will significantly increase the exposure of the public to air toxics in the neighborhoods along the US–95 corridor." (*Id.*)

The RSG Study recommended that FHWA complete a SEIS to evaluate the health risks posed by this increased exposure and identify alternatives to mitigate those effects. (*Id.*)

Sierra Club also commissioned the Environmental Health & Engineering Group to conduct a second study ("EHE Study") to consider whether the increased exposure projected by the RSG Study likely would result in cancer risks and other adverse health outcomes. (AR 35–16744; 35–16764–35–16782.) The EHE Study concluded that the increased exposure to vehicle emissions found near heavily traveled highways would result in significantly increased health risks, including a higher risk of cancer and harmful respiratory and cardiovascular effects. (AR 35–16781–35–16782.) Like the RSG Study, the EHE Study recommended that FHWA prepare a SEIS to evaluate the health risks and identify alternatives to mitigate those risks. (AR 35–16782.)

FHWA again denied Sierra Club's request. FHWA concluded "[t]he influence of this US–95 project could not currently be estimated in any meaningful way," and that even if it were "possible to generate credible estimates of whether emissions of these compounds increase or decrease, we still would not know whether these emission levels are likely to adversely impact health." (AR 35–16884.) The FHWA contended that MSATs are predicted to decrease in coming years due to cleaner burning fuels, new emission standards, and retirement of older vehicles. (AR 35–16883–35–16884.) FHWA concluded that "given the shortcomings in existing analytical techniques, and the continuing decline in toxic vehicle emissions, an SEIS would not help the NEPA decisionmaker or the public understand whether exposure to some level of emission resulting from the project is harmful." (AR 35–16884.) Con-

sequently, FHWA again rejected Sierra Club's request for a SEIS.[12] (AR 35–16885.)

CEQ regulations implementing NEPA provide guidance on when an effect is "significant" based on the effect's context and intensity. 40 C.F.R. § 1508.27. Context means that the significance of an action "varies with the setting of the proposed action." *Id.* § 1508.27(a). Significance for a site-specific action such as the US–95 widening project "would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* Intensity includes such considerations as the degree to which the proposed project affects public health or safety, the degree to which the project's effects are uncertain, and the degree to which the potential effects of the project are highly controversial. *Id.* § 1508.27. Uncertainty mandates preparation of an EIS where the uncertainty "may be resolved by further collection of data, or where the collection of such data may prevent speculation on potential . . . effects." *National Parks & Conservation Ass'n*, 241 F.3d at 732 (internal citation and quotation omitted). A federal action is "controversial" when "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor, or there is a substantial dispute [about] the size, nature, or effect of the major Federal action." *Id.* at 736 (internal citations and quotations omitted). Once an environmental plaintiff establishes a controversy, the agency must present a " 'well-reasoned explanation' demonstrating why those responses disputing the [agency's] conclusions do not suffice to create a public controversy based on potential environmental consequences." *Id.* (quotation omitted).

Sierra Club has established a controversy exists over the public health impacts of MSATs. Sierra Club has presented studies suggesting links between MSATs and carcinogenic risk in the form of the MATES–II, Leukemia Study, RSG Study, and EHE Study. The suspected link between various air pollutants and adverse health impacts is sufficiently controversial that EPA and FHWA intend to study the matter further. (AR 35–16881.)

FHWA has presented a well reasoned response as to why these studies do not create a public controversy sufficient to require FHWA to prepare a SEIS. FHWA also has explained why the uncertainty surrounding MSATs' potential human health risks does not warrant preparation of a SEIS.

According to FHWA's analysis, no current methods exist to reliably measure MSATs, and then to determine, based on these emission levels, what risk MSATs pose to human health. (AR 35–16884.) The MATES–II study assigned seventy

---

**12.** Following this correspondence, FHWA commissioned a study by Sonoma Technology, Inc. ("STI") to "further explain recent research in the transportation-air toxics field and to assess the transferability or applicability of this research to the proposed U.S. 95 project in Las Vegas." (AR 35–16886; 35–16889–35–16952.) STI's study, "Transportation–Related Air Toxics: Case Study Materials Related to U.S. 95 in Nevada," concluded MATES–II's results are not transferrable to US–95 due to a lack of air toxics inventory in Las Vegas; differences between Las Vegas and Los Angeles in topography, weather, and vehicle fleet; and the region-wide focus of MATES–II compared to the project-specific study that would be needed for the US–95 project. (AR 35–16887; 35–16906; 35–16929–35–16931.) STI also concluded the existing science does not conclusively correlate road proximity and health risk. (AR 35–16887; 35–16906.) Additionally, STI noted that regional air toxics levels have declined and are expected to continue to decline as a result of emission restrictions and fuel standards. (AR 35–16940–35–16941.)

percent of the MSAT risk to diesel particulate matter, but no generally accepted scientific method exists for measuring diesel particulate matter. (AR 34–16703.) Monitors must use elemental carbon as a surrogate. (*Id.*) In addition to monitoring difficulties, current science has not determined whether MSATs are a regional or localized effect. EPA and other environmental agencies have addressed MSATs on the regional and national scale, rather than taking project-specific measures. (AR 35–16883.) According to FHWA's evaluation, the effect of localized, specific projects on MSAT emission levels presently is unknown. (*Id.*)

Even if FHWA could generate accurate emissions data, FHWA concluded it could not use that data to generate credible estimates of the human health risk posed by MSATs. FHWA explained that although EPA published a rule on MSATs, EPA has not identified MSATs as carcinogens, nor has it assigned a level at which MSATs begin to affect human health. (AR 35–16882.) EPA stated in its MSAT rule that inclusion on the list of MSATs "is not itself a determination by EPA that emissions of the compound in fact present a risk to public health or welfare, or that it is appropriate to adopt controls to limit the emissions of such a compound . . . ." (*Id.* [66 Fed.Reg. 17230, 17234 (Mar. 29, 2001) ].) Further, FHWA explained that EPA does not make such designations on a handful of studies such as Sierra Club has offered, but on thousands of peer-reviewed analyses. (AR 35–16882.) Consequently, FHWA concluded a SEIS evaluating MSATs, which may or may not be harmful and for which present science cannot accurately measure either the size of the effect or its impact on human health, would not be helpful to the public or the NEPA decision maker. (*Id.*)

Based on this analysis, FHWA's decision not to prepare a SEIS was not arbitrary and capricious. FHWA considered the relevant factors and made a factual finding that the new information on MSATs was not sufficiently significant to require preparation of a SEIS. The Court must defer to this finding without regard to whether this Court would have made the same decision based on the same evidence. *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851. The Court will not disturb FHWA's "reasoned decision based on its evaluation of the significance-or lack of significance-of the new information." *Id.*

### B. Fine Particulate Matter (PM$_{2.5}$)

In its second request letter, Sierra Club also requested that FHWA prepare a SEIS to evaluate the proposed project's impacts resulting from fine particulate matter (PM$_{2.5}$). (AR 35–16747.) FHWA contends this claim is not properly brought as a request for a SEIS because it is not based on "new information."

EPA established the NAAQS standard for PM$_{2.5}$ in 1997. (AR 30–14724 [Particulate Matter NAAQS, 62 Fed.Reg. 38,652 (July 18, 1997) ].) The FEIS discusses this standard, and notes that EPA had not yet designated any areas for nonattainment. (AR 30–14724.) Because EPA established the NAAQS standard for PM$_{2.5}$ at the time of the FEIS, and the FEIS itself discusses that standard, Sierra Club's contention the FEIS failed to consider PM$_{2.5}$ is not based on "new" information. *See* 40 C.F.R. § 1502.9(c)(1)(ii); 23 C.F.R. § 771.130(a)(2). Consequently, Sierra Club's argument that FHWA must consider PM$_{2.5}$ impacts properly belongs in Count 1 as evidence FHWA prepared an inadequate EIS, but not as a claim FHWA must prepare a SEIS based on "new information."

Sierra Club presented some "new" evidence EPA set the NAAQS standard for $PM_{2.5}$ too low to protect human health. (AR 35–16747–35–16753.) But EPA is statutorily commanded to set NAAQS at a level sufficient to protect human health. 42 U.S.C. § 7409(b)(1). FHWA does not act arbitrarily and capriciously by relying on the prevailing NAAQS standard EPA has set. *See Border Power Plant Working Group v. Dept. of Energy,* 260 F.Supp.2d 997, 1021 (S.D.Cal.2003) ("If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health.").

### C. Induced Travel

In its first request letter, Sierra Club also requested that FHWA prepare a SEIS to evaluate the effects of induced travel. (AR 34–16447.) Like Sierra Club's $PM_{2.5}$ claim, induced travel was brought to FHWA's attention during the original EIS process and properly belongs in Count 1 as an argument FHWA prepared an inadequate EIS.

### D. Sierra Club's Third Motion to Supplement the Record

On March 4, 2004, Sierra Club filed a third request to supplement the record. Sierra Club requested the Court take into consideration recently-issued EPA policy guidance officially approving the emissions model MOBILE6.2. MOBILE6.2 "expands the capabilities of [EPA's prior approved model] to include the estimation of both direct particulate matter (PM) emissions ... as well as air toxics emissions ...." (Third Mot. to Supplement R., Ex. A at 1.)

The Court will grant Plaintiff's Third Motion to Supplement the Administrative Record. FHWA does not oppose the Court considering this information. (Fed.

Defs.' Resp. to Pl.'s Third Mot. to Supplement the Administrative R. at 2.) Furthermore, this Court's prior Order indicated that in a case involving a challenge to an agency's failure to act, such as its refusal to prepare a SEIS, the Court may consider evidence outside the administrative record. (Order, Feb. 14, 2003 [Doc. # 34], at 11–15.)

Having agreed the new EPA policy guidance is properly before the Court for consideration, the parties dispute the significance and meaning of this new information. Sierra Club contends FHWA now must prepare a SEIS because the agency no longer can argue it does not have a suitable model with which to predict emissions from the proposed project. FHWA responds MOBILE6.2 is not a project-specific model, currently has no bearing on NEPA analyses, and models only emissions, not attendant health effects corresponding to those emissions.

Because FHWA did not have EPA's approved and finalized MOBILE6.2 model at the time it made all the prior decisions in this case, this new information does not invalidate those decisions. *See, e.g., Wash. State Farm Bureau v. Marshall,* 625 F.2d 296, 306 (9th Cir.1980) (noting that district court reviewing agency action under APA must "scrutinize[ ] the evidence that was before the agency when it made its decision ...."*) (citing *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)); *Amoco Oil Co. v. Envtl. Prot. Agency,* 501 F.2d 722, 729 n. 10 (D.C.Cir. 1974) ("A reviewing court must tread cautiously in considering events occurring subsequent to promulgation of a rule. Obviously, such events did not inform the agency decision-making which is the subject of review.").

In essence, Sierra Club's motion to supplement is a third request for FHWA to prepare a SEIS based on new information.

FHWA's response to that motion is, at bottom, a finding that MOBILE6.2 is not significant new information requiring the agency to prepare a SEIS.

FHWA's decision that EPA's policy guidance does not constitute significant new information warranting preparation of a SEIS is not arbitrary and capricious. EPA's policy guidance approves MO-BILE6.2 as a tool in preparing state implementation plans and conformity analyses. The policy guidance itself states that EPA's issuance of this policy guidance has limited NEPA applicability:

> While MOBILE6.2 is EPA's best available tool for quantifying toxics emissions from on-road vehicles, its availability has no direct bearing on the administration of the National Environmental Policy Act (NEPA). The Department of Transportation has responsibility for implementing NEPA for Federally funded or approved transportation projects, and it is currently developing a policy on how mobile source air toxics should be addressed in NEPA analyses, in consultation with EPA.

(Third Mot. to Supplement R., Ex. A at 10.) According to FHWA, MOBILE6.2's application in NEPA analyses needs further evaluation because of model limitations. For example, as Sierra Club conceded at the hearing on this motion, MOBILE6.2 is not a project-specific tool. Additionally, the model predicts emissions only, not health impacts associated with those emissions.

FHWA is working on developing NEPA guidance regarding how MOBILE6.2 factors into future NEPA evaluations. But FHWA has determined that, in the mean time, it need not bring a halt to projects currently pending to implement this new model. That decision is consistent with EPA's policy guidance, which includes a two-year grace period before nonattainment areas must utilize MOBILE6.2 in state implementation plans and conformity determinations. (Third Mot. to Supplement R., Ex. A at 5.) It also is consistent with the Supreme Court's admonition that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh,* 490 U.S. at 373, 109 S.Ct. 1851 (internal footnote omitted).

Because FHWA's decisions not to prepare a SEIS were not arbitrary and capricious, the Court will grant summary judgment in favor of Defendants on Count 5.

## VI. VIOLATION OF FEDERAL HIGHWAY STATUTES AND REGULATIONS

The Federal–Aid Highway Act, 23 U.S.C. §§ 101 *et seq.,* provides the statutory basis for the Federal–Aid Highway Program (FAHP). FAHP is a program through which States may receive federal funding assistance for transportation construction and improvements. *Id.* FHWA administers the FAHP. FAHP requires FHWA to consider certain requirements to determine whether the State projects are eligible for federal funding. Sierra Club alleges FHWA violated two of these requirements: (1) to consider and mitigate adverse impacts of air pollution under 23 U.S.C. § 109; and (2) to hold public hearings under 23 U.S.C. § 128.

### A. Failure to Consider and Mitigate Adverse Effects of Air Pollution (Count 6)

Section 109 is a general policy statement which does not imply a private right of action. *See Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 186

(4th Cir.1999); *Wykle,* 157 F.Supp.2d at 465. Although § 109 does not provide a private cause of action, Sierra Club may challenge FHWA's actions under the APA. *Wykle,* F.Supp.2d at 465. As stated previously, the Court may not overturn an agency decision under the APA unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Pursuant to § 109, the Secretary of US-DOT is required to ensure that plans for proposed highway projects will "adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance." 23 U.S.C. § 109(a). Section 109 also requires the Secretary to "promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects," including air pollution. *Id.* § 109(h).

To that end, FHWA regulations set forth requirements under NEPA and § 109(h) for the processing of highway and urban mass transportation projects. 23 C.F.R. § 771.101. Those regulations require FHWA to perform § 109(h) analyses as part of the NEPA process. *Id.* § 771.105. As part of its NEPA review, FHWA must evaluate alternative courses of action and make decisions "in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement;

and of national, State, and local environmental protection goals." *Id.* § 771.105(b). The regulations also require FHWA to incorporate "[m]easures necessary to mitigate adverse impacts ...." *Id.* § 771.105(d).

Sierra Club argues FHWA violated these provisions because it failed to consider health effects of air pollution and fine particulate matter in the initial EIS. Sierra Club also argues the EIS failed to consider and identify mitigation measures as required. FHWA responds that because carbon monoxide emissions will be reduced under the proposed project, no mitigation plans are required. As to particulate matter ($PM_{10}$), FHWA argues the EIS adopts a detailed mitigation plan. And as far as fine particulate matter and MSATs are concerned, FHWA argues that because "NEPA does not require consideration of the health impacts of MSAT in conjunction with the US–95 project, neither does 23 U.S.C. § 109." (Fed. Defs. Mot. for Summ. J. at 45.)

With respect to carbon monoxide, the proposed project is itself a mitigation plan. Compared to the "no build" alternative, the proposed project will reduce both the number and severity of carbon monoxide NAAQS violations. (AR 34–16408.) As to $PM_{10}$, the EIS adequately incorporates § 109 concerns, including a detailed mitigation plan. (AR 31–14878–31–14881.) "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated." *Laguna Greenbelt,* 42 F.3d at 528. Consequently, the Court will grant summary judgment in favor of Defendants on Count 6.

## B. Failure to Hold Public Hearings (Count 7)

Finally, Sierra Club argues FHWA violated the public hearing requirements under 23 U.S.C. § 128. Sierra Club contends § 128 requires the traditional public hearing format where members of the public can address their comments to all in attendance, both agency personnel and other members of the public. FHWA responds that the "open house" format fulfills § 128's public hearing requirements.

Section 128 requires every state highway department that has submitted plans for a federal-aid highway project that traverses a city or town to certify that it either has conducted public hearings or has afforded the opportunity for such hearings and has considered the environmental, economic, and social effects of the project on the selected location. 23 U.S.C. § 128(a). When such hearings have been held, the state transportation department must submit a copy of the hearing's transcript to the Secretary of USDOT, together with the certification and a report indicating the consideration given to the above factors. *Id.* § 128(b).

FHWA regulations require states seeking financial assistance under the FAHP to "have procedures approved by the FHWA to carry out a public involvement/public hearing program pursuant to 23 U.S.C. 128 . . . ." 23 C.F.R. § 771.111(h)(1). The state procedures must provide for "[o]ne or more public hearings or the opportunity for hearing(s)" at a convenient time and place. *Id.* § 771.111(h)(2)(iii). At the hearing, the state agency must explain the project's purpose and need; alternatives to the project; the social, economic, environmental, and other impacts of the project; relocation assistance and right-of-way acquisition process; and procedures for receiving both oral and written statements from the public. *Id.* § 771.111(h)(2)(v).

Following the public hearing, the state agency must submit to FHWA "a transcript of each public hearing and a certification that a required hearing or hearing opportunity was offered. The transcript will be accompanied by copies of all written statements from the public, both submitted at the public hearing or during an announced period after the public hearing." *Id.* § 771.111(h)(2)(vi).

Pursuant to these regulations, NDOT developed and submitted to FHWA a public procedure plan. (AR 01–00038–01–00047.) The procedures permit NDOT to hold open house style hearings. (AR 01–00044.) At the open house hearings, citizens may comment on the project either through written statement at the hearing by way of a comment card, oral statement at the hearing to a stenographer, or by letter within fifteen days after the open house. (*Id.*) At the hearing, displays are placed about the area, information is handed out to attendees, and NDOT representatives are on hand to speak with the public. (*Id.*) The procedures require that each public hearing indicate that the following are open for discussion: the project's purpose and need; alternatives to the project; the social, economic, environmental, and other impacts of the project; relocation assistance and right-of-way acquisition process. (AR 01–00046.) For open house hearings, the "transcript" consists of "a verbatim written transcript of all comments made to the court reporter." (AR 01–00047.) FHWA approved NDOT's proposed procedures as "in compliance with the requirements of 23 USC 109 and 128 and 23 CFR 771." (AR 01–00037.) For the US–95 widening project EIS, NDOT held two open house format public meetings on June 9 and 10, 1999. (AR 28–13670; 29–14040; 34–16715.)

FHWA interprets § 128 to permit open house style meetings as fulfilling the

statutory public hearing requirement. In reviewing an agency's interpretation of a statute it is entrusted with administering,[13] the Court employs the two-part test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the Court must determine whether Congress' intent is clear as to the precise issue involved. *City of Los Angeles v. U.S. Dept. of Commerce*, 307 F.3d 859, 868–869 (9th Cir.2002) (citing *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778). If Congress' intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. But " 'if the statute is ambiguous as to the question at issue, then [the Court must] determine the meaning of the statute's language by giving deference to the governing agency's interpretation of the statute's language.' " *City of Los Angeles*, 307 F.3d at 869 (quoting *Royal Foods Co. v. RJR Holdings Inc.*, 252 F.3d 1102, 1106 (9th Cir.2001)). An agency interpretation that is entitled to *Chevron* deference "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *U.S. v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

▮ Not all agency interpretations are entitled to *Chevron* deference, however. "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226–227, 121 S.Ct. 2164.

Title 23 U.S.C. § 128 is ambiguous in the sense that it provides no definition of the terms "public hearing" or "transcript." The statute does not indicate what format the hearings must take. The plain term "public hearing" does not necessarily preclude an open house format. FHWA's open house formats were open to anyone who wished to observe, and members of the public had a right to appear and present evidence by oral statement to the stenographer, written comment cards, or letter. The term "transcript" also is ambiguous. At the open houses, FHWA provided a stenographer to take down a copy of oral testimony by any citizen who wished to comment. Section 128 does not, by its express terms, require a verbatim transcript of the proceedings.

Because the statute is ambiguous, the Court must determine whether Congress delegated authority to FHWA generally to make rules carrying the force of law under § 128, and whether FHWA's interpretation claiming deference was promulgated in the exercise of that authority. *Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164. Section 128 contains no express language delegating rulemaking or adjudicatory authority to FHWA with respect to what constitutes a public hearing. *Compare* 23 U.S.C. § 128 *with* 23 U.S.C. §§ 106, 109(c)(2), 109(g), 109(h), 109(i), 112(a), 112(e). But the statutory framework and other circumstances suggest FHWA is authorized to make a determination carrying the force of law as to what constitutes a public hearing. Under the FAHP, each state transportation department seeking federal financial assistance must submit plans and specifications for approval by the Secretary of Transportation. 23

---

**13.** Section 128 is specific to the FAHP, which is administered by the FHWA through US-

DOT. Consequently, FHWA is charged with administering § 128.

U.S.C. § 106(a). For each such plan, the state must certify it has held public hearings in accordance with § 128. Implicit in this framework is FHWA's power to disapprove of state plans if the public hearings were nonexistent or inadequate. Without such a prerogative, the Secretary could not ensure adequate public involvement or an adequate record on which to base the USDOT's decision to approve or disapprove funds. Consequently, Congress implicitly granted FHWA rulemaking authority to specify what steps state transportation departments must take to fulfill § 128's requirements.

■■■ Under this rulemaking authority, FHWA has promulgated regulations requiring state transportation agencies to seek FHWA's approval of their public information and involvement plans. 23 C.F.R. § 771.111(h)(1). Regulations issued under the usual notice-and-comment procedures generally are entitled to *Chevron* deference. *Pacheco–Camacho v. Hood*, 272 F.3d 1266, 1268 (9th Cir.2001).

In 1987, FHWA's Office of Environmental Policy issued a memo expressing its view that § 771.111 has "sufficient flexibility to allow for the 'open house' format." (AR 01–00018.) FHWA based this conclusion on a study of open house hearings conducted in three states. (AR 01–00019–01–00036.) The study concluded that open house hearings complied with § 128 and FHWA regulations for public hearings. (AR 01–00022–01–00024.) The study also concluded the open house format results in a variety of benefits over the traditional public hearing format. Such benefits included the opportunity for citizens to get specific answers to specific questions, a greater number of comments from attendees, and increased convenience in meeting times as open houses are spread out over several hours rather than according to a rigid start time. (AR 01–00015.) The study also noted other benefits, such as shortening the length of a traditional meeting, limiting "emotionally charged" comments, and preventing hearings from being dominated by one individual or group. (AR 01–00025, 01–00030.)

■■■ FHWA's interpretation of its own regulation is entitled to substantial deference. *Pronsolino v. Nastri*, 291 F.3d 1123, 1133 (9th Cir.2002). An agency's interpretation of its own regulation "controls 'so long as it is "reasonable," that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.'" *Lal v. I.N.S.*, 255 F.3d 998, 1004 (9th Cir.2001), *amended by* 268 F.3d 1148 (2001) (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). Even if FHWA's interpretation is not entitled to *Chevron* deference, it "still may be entitled to a respect proportional to its power to persuade." *Hall v. U.S. EPA*, 273 F.3d 1146, 1156 (9th Cir.2001) (quotation omitted) (citing *Mead*, 533 U.S. at 234–35, 121 S.Ct. 2164, and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). The persuasiveness of an agency's interpretation may be based on such factors as "its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." *Id.* (quotation omitted).

■■■ FHWA's interpretation of its regulation on public hearings to permit open houses, although not free from criticism, is reasonable. *See Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830 (9th Cir. 2002) ("It is not necessary, however, that [the court] conclude that the [agency's] interpretation is the one [the court] would adopt. [The court is] called upon to determine only whether the [agency's] interpretation 'is based on a permissible construction of the statute.'") (quoting *Chevron,*

467 U.S. at 843, 104 S.Ct. 2778). The open house format conforms to the purposes of 23 U.S.C. § 128 and 23 C.F.R. § 771.111 by permitting citizens to interact with agency officials, learn the details of the proposed projects, discuss with agency representatives potential impacts, ask specific questions, and make comments in a variety of means, both oral and written. Nothing in the plain text of either the statute or the regulation rules out open houses as conforming with the public hearing requirement. Consequently, the Court will grant Defendants' motion for summary judgment on Count 7. In doing so, however, the Court is compelled to address what it views as serious deficiencies in the "open house" style of public meeting for addressing matters of such importance to the public.

Although FHWA's interpretation is legally adequate, the legislative history and the purposes underlying § 128 raise serious questions as to whether "open house" style meetings give full force to the purposes underlying § 128's public hearing requirement. Legislative history suggests Congress had a preference for "quasi-legislative" and "town hall" formats under § 128. H.R.Rep. No. 91–1554 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5392, 5395–5397; *see also Lathan,* 506 F.2d at 691 (quoting H.R.Rep. No. 91–1554). Open houses do not necessarily fall outside these parameters. Nevertheless, both town hall and quasi-legislative hearings suggest a more formal presentation of arguments both by the entity holding the hearing and by members of the public.

Congress enacted § 128 "primarily for the benefit of the local residents whose homes and lives may be affected by a national highway construction project." *D.C. Fed'n of Civic Ass'ns, Inc. v. Volpe,* 434 F.2d 436, 440 (D.C.Cir.1970). Public hearings fulfill two major congressional

goals. First, the hearings are designed "to make sure that state planning officials are apprised of the nature and depth of local residents' feelings about the wisdom of a particular project." *D.C. Fed'n,* 434 F.2d at 440; *see also* H.R.Rep. No. 91–1554 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5392, 5396 ("the hearings … constitute an important interface between the state highway departments and the public affording both an opportunity to receive and exchange information on proposed highway projects"). Second, the hearings "provide a formal means of documenting, ascertaining, testing and filtering all possible environmental, community, and transportation elements" related to highway projects to ensure effective agency decision-making. H.R.Rep. No. 91–1554 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5392, 5395.

The open house format dilutes the achievement of both of these objectives. FHWA's open house format limits the opportunity for citizens to "directly *and publicly*" confront agency decision-makers with opposing views. *D.C. Fed'n,* 434 F.2d at 441 (emphasis added). Open houses diffuse the "public" character of the hearings, producing instead many private meetings between agency representatives and individual members of the public. Citizens do not hear every question, comment, or concern voiced by other citizens, nor do they hear the agency's response. Consequently, concerned citizens lose the ability to inform and influence their fellow citizens' views. Additionally, the open house format diffuses the pressure that comes from a direct and public challenge to the agency from a live audience member.

In the Court's view, the purpose of providing a record from which informed agency decisionmaking can be made is weakened by the open house format. No

verbatim recording of the proceedings is made under this procedure. (AR 34–16715.) Consequently, neither the public nor agency decisionmakers acquire a complete picture of the interaction between the public and the agency. Moreover, without a verbatim transcript, agency decision-makers are ill equipped to ensure state transportation agencies fulfill their statutory duty to "consider the environmental, economic, and social effects of the project on the selected location." 23 U.S.C. § 128(a).

FHWA's mission is not simply to approve state transportation agencies' procedures that are legally sufficient. As commanded by the letter and spirit of NEPA, § 128, FHWA should seek to maximize public involvement and empower the citizenry. Although not an unreasonable interpretation of the statute and regulations, the Court would urge the FHWA to reconsider whether the open house format optimizes public involvement.

## VII. CONCLUSION

IT IS THEREFORE ORDERED that Sierra Club's Third Motion to Supplement the Administrative Record and Request for Judicial Notice (Doc. # 100) is hereby GRANTED.

IT IS FURTHER ORDERED that Sierra Club's Motion for Summary Judgment (Doc. # 76) is hereby DENIED.

IT IS FURTHER ORDERED that Federal Defendants' Motion for Summary Judgment (Doc. # 74) is hereby GRANTED. Judgment is hereby entered in favor of Defendants and against Plaintiff.